UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
                                            :

PLAYER TO BE NAMED LATER, LLC, and      :
SMOKEY JOE'S CAFÉ BROADWAY REVIVAL LLC,  :
                                            :

                        Plaintiffs,       :

                                            :      **COMPLAINT**

              -- against --            :

                                            :

UBS FINANCIAL SERVICES, INC.                :
and UBS AG BANK,                                :

                        Defendants.      :

------------------------------------------------------------------------ x

## PRELIMINARY STATEMENT

Plaintiffs Player to be Named Later, LLC ("PTBNL") and Smokey Joe's Café Broadway Revival LLC ("SJC" and together, "Plaintiffs"), by their attorneys, The Law Office of Kevin Galbraith, bring this action against Defendants UBS Financial Services, Inc. ("UBS Financial Services") and UBS AG Bank ("UBS Bank" and together "UBS Defendants" or "Defendants"). The bases for their claims against Defendants are set forth below.

By their unlawful conduct, the UBS Defendants substantially contributed to a successful scheme to defraud Plaintiffs of $3.5 million that they had raised and contributed as part of their efforts to stage theatrical productions of "Bull Durham" and "Smokey's Joe's Café," respectively.

Plaintiffs bring this action to recover the losses they have suffered due to the UBS Defendants' aiding and abetting fraud; aiding and abetting breach of fiduciary duty; negligence and gross negligence; negligent supervision; independent breaches of fiduciary duty; and breaches of regulatory rules that give rise to private rights of action.

## JURISDICTION and VENUE

1.      Plaintiffs are limited liability corporations located in New York. Their individual members are companies domiciled in New York, and the natural persons who own those companies are citizens of New York, New Jersey and Ohio.

2.      Defendant UBS Financial Services, Inc. is a registered broker-dealer incorporated in Delaware and with a principal place of business in Weehawken, New Jersey.

3.      Defendant UBS AG Bank is a Swiss corporation with offices in New York, Connecticut and throughout the United States.

4.      Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, based on the complete diversity of the Plaintiffs (and their individual members) and Defendants, and because the amount in controversy exceeds $75,000.

5.      Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because Defendants operate in this judicial district and purposefully directed their business conduct to Plaintiffs within the district, and because a substantial part of the events at issue occurred in this judicial district.[1]

## THE PARTIES and RELEVANT NON-PARTIES

6.      Plaintiff Player to be Named Later, LLC ("PTBNL") is a company formed to finance and stage a Broadway production of "Bull Durham," based upon the film of the same name.

7.      Plaintiff Smokey Joe's Café Broadway Revival LLC ("SJC") is a company formed to finance and stage a Broadway production of "Smokey Joe's Café: The Songs of Leiber and Stoller," the Tony-Award-nominated musical revue.

---

[1] In addition, Defendant UBS Financial Services has conceded jurisdiction and venue are proper in this Court, at least with respect to Plaintiffs and itself. Specifically, when Plaintiffs earlier filed a claim for arbitration with FINRA Dispute Resolution, Defendant moved to enjoin Plaintiffs from pursuing that arbitration by filing a complaint in this Court, which was dismissed without prejudice on consent on the parties.

8.     Defendant UBS Financial Services, Inc. is a registered broker-dealer incorporated in Delaware and with a principal place of business in Weehawken, New Jersey.

9.     Defendant UBS AG Bank is a Swiss corporation.

10.     Non-party Benjamin McConley ("McConley") is the principal of Forrest Capital Partners, Inc. McConley is a primary architect of the fraud; he has pleaded guilty to federal charges related to the fraud.

11.     Non-party Jason Van Eman ("Van Eman") is the principal of Weathervane Productions, Inc. Van Eman is a primary architect of the fraud; he has been indicted on federal charges related to the fraud.

12.     Non-party Holidae Hayes ("Hayes") is a financial advisor registered with Defendant UBS Financial Services. Hayes was primarily responsible for opening, overseeing and administering the accounts at issue.

13.     Non-party Adam Falkoff ("Falkoff") is the President and Principal of Capital Keys, a lobbying firm located in Washington, DC. Plaintiffs possess evidence to suggest that Falkoff was instrumental in persuading UBS Financial Services to open the account at issue and to keep them open, overcoming the concerns of Hayes.

## STATEMENT OF FACTS

### The Parties' Backgrounds

14.     Plaintiffs are companies whose members have substantial experience with financing and staging Broadway theater productions. Plaintiffs' members are well known to each other as colleagues and fellow members of the Broadway community. They were ensnared in the same fraudulent scheme on parallel tracks, executed using Defendants' systems and employees, at virtually the same time.

3

15.     Defendants have a long history of legal trouble stemming from their unlawful misconduct, including repeated instances in which it either engaged in fraudulent, deceptive and unethical conduct itself, or else allowed its various platforms to be utilized for fraudulent purposes—both civil and criminal. The paragraphs below focus on the publicly documented misconduct from just the past several years.

16.     Whether operating in Europe and other nations, or in the Americas, all the UBS entities are ultimately owned and controlled by the corporate parent, Switzerland-based UBS AG. For purposes of this section, each of the UBS entities is referred to simply as "UBS."

17.     In 2016, French prosecutors filed a 126-page "prosecution summary" against UBS, alleging "aggravated laundering of tax fraud," the culmination of a years-long investigation.

18.     In 2016, Singapore's financial regulator found UBS guilty of 13 violations concerning the corruption and money-laundering investigation into the Malaysian state fund, 1MDB.

19.     In 2015, the UBS parent company, UBS AG, was found to have violated its earlier non-prosecution agreement and pleaded guilty to a felony count concerning illegal and manipulative foreign currency trading, paying a criminal penalty of $203 million.

20.     In 2015, UBS was fined nearly $500,000 for willfully violating the anti-fraud provisions of the federal securities laws, concerning municipal securities.

21.     In 2013, UBS was fined $13 million by French authorities who found that the bank had failed to live up to an earlier promise to tighten up controls on money laundering and other financial fraud.

22.     In 2012, UBS's Japanese affiliate pleaded guilty to wire fraud and UBS agreed to pay $1.5 billion to several countries' regulators for its role in the notorious LIBOR-fixing scandal.

23.     In 2011, UBS paid a total of over $47 million to resolve a bid-rigging case brought by the SEC concerning its "fraudulent practices and misrepresentations" relating to municipal securities.

24.     In 2010, UBS was fined over $2 million by the State of Connecticut, citing its "dishonest and unethical business practices" concerning the sale of auction rate securities.

25.     In 2009, UBS paid $780 million to the U.S. Department of Justice to resolve a case in which it was accused of helping American citizens hide billions of dollars in secret Swiss accounts to evade taxes. The settlement permitted UBS to avoid its own criminal prosecution.

26.     The forgoing paragraphs help illustrate two facts that are critical to this matter: (1) the UBS Defendants have a long and plainly demonstrable history of either affirmative unlawful conduct of their own, or grossly negligent conduct in permitting others to utilize their financial services platforms to defraud others; and (2) despite billions in criminal fines, civil penalties and disgorgement orders, they do not appear to have drawn any meaningful lesson from their prior failures, and are recidivists.

27.     It is this history of unlawful conduct, paired with an apparent refusal to reform themselves, that sets the stage for the massive losses at the heart of this case.

## The Frauds

28.     As Plaintiffs undertook their efforts to finance their projects, "Bull Durham" and "Smokey Joe's Café," respectively, they explored the possibility of working with two entities, Weathervane Productions, Inc. ("Weathervane") and Forrest Capital Partners, Inc. ("Forrest Capital"), headed by Van Eman and McConley, respectively. To Plaintiffs' understanding, Weathervane and Forrest Capital had successfully financed several film projects, and were interested in moving into the realm of Broadway theater.

29.     On one prior occasion, some members of the Smokey Joe's Plaintiffs had successfully worked with Forrest Capital and Weathervane on the financing of "Penn & Teller on Broadway,"

which gave confidence to Plaintiffs that undertaking these new transactions with them was a sound business decision.

30.     Plaintiffs reached separate—but essentially identical—deals with Weathervane and Forrest Capital, wherein Plaintiffs would contribute the initial funds, then Forrest Capital would match those initial contributions on its own behalf and on behalf of Weathervane. In the case of PTBNL, the amount contributed by Plaintiffs was $2.5 million; and in the case of SJC, the amount was $1 million.

31.     The deals were papered with Funding Agreements reached among each of the Plaintiffs, on the one hand, and Weathervane Productions and Forrest Capital, on the other hand.

32.     The Plaintiffs understood that UBS Financial Services had received copies of the Funding Agreements prior to or contemporaneous with wiring the funds to UBS AG Bank, for further credit to UBS Financial Services. Therefore, upon information and belief, the Defendants were on notice of the provisions described below.

33.     As described herein, UBS Financial Services was the designated financial institution that would host the accounts to be utilized in the contemplated transactions, and UBS AG Bank was the bank that would initially receive the Plaintiffs' contributions. The involvement of the Defendants, widely recognized and long-established companies in highly regulated industries, gave Plaintiffs confidence to consummate the deals.

34.     The Funding Agreements specified that a "Master Account" would be set up at UBS Financial Services, and that a representative for each of the three parties would be the only authorized signatories, and that "all transactions concerning the Master Account" would "require the execution of all three signatories." Both PTBNL and SJC designated their respective authorized

signatories. Plaintiffs completed UBS Financial Services paperwork reflecting this arrangement. The relevant portions of the referenced documents are attached as Exhibit A.

35.    The Plaintiffs fulfilled their obligations by wiring the initial tranches to UBS AG Bank, with wire memos indicating that the funds were to be used exclusively for the stated purposes: $2.5 million for "PTBNL Investment for the WVP Line of Credit for 'Bull Durham'" and $1 million for "SJC Investment for the WVP Line of Credit for 'Smokey Joe's Café: The Songs of Leiber and Stoller.'"

36.    Plaintiffs received written confirmation that UBS AG Bank received the wired funds, with these designations. Wire confirmations demonstrating the wires to "UBS AG NYC" in Stamford, Connecticut, for further credit to UBS Financial Services, are attached as Exhibit B.

37.    Under the terms of the Funding Agreements, Weathervane and Forrest Capital were, within a prescribed period, to match the Plaintiffs' initial investments. Under no circumstances were the funds that had been wired to be used or diverted for any purpose other than to fund the production of the plays.

38.    Rather than safeguard the funds, consistent with the Funding Agreement and the brokerage account agreements, Weathervane and Forrest Capital began looting the funds almost immediately.

39.    For example, PTBNL has since learned that after the $2.5-million wire was received on June 17, 2016, four payments went out of the account the same day, including a payment to McConley's brother and another to a Washington, DC consulting firm called Capital Keys. The payment to Capital Keys was for $60,000.

40.    The President and Principal of Capital Keys is Falkoff. As outlined below, it was Falkoff who pressured a reluctant and dubious UBS Financial Services financial advisor Hayes to open

the accounts and keep them open. Whether the payment to Falkoff was to compensate him for his efforts in opening the UBS accounts is a question that will be explored in discovery.

41.     On June 21, 2016, several more payments went out, including a payment to McConley and one to a Forrest Capital bank account in Florida. And by September 7, 2016, it now appears that the entire $2.5 million had been stolen.

42.     During this period between PTBNL's initial wire and the closure of the account less than twelve weeks later, PTBNL worked to determine what was happening with its funds, putting Weathervane and Forrest Capital on notice of its breaches, and reaching out to UBS Financial Services to learn what was going on. It was only after repeated inquiries to UBS personnel that PTBNL finally learned that the entire $2.5 million it had entrusted to Weathervane, Forrest Capital and the UBS Defendants was gone.

43.     In the case of SJC, its wire of just over $1 million was sent to—by way of UBS AG Bank— the dedicated UBS Financial Services account, on or about March 17, 2016. Like PTBNL did, SJC worked urgently to learn from Weathervane, Forrest Capital and UBS Financial Services the fate of its funds, but has not yet been able to do so.

44.     While there is less detail available about what happened to the SJC funds, neither the initial $1 million, nor the matching funds that were to be provided, was ever returned. Upon information and belief, it been stolen.

45.     On July 25, 2019, the United States Attorney's Office for the Southern District of Florida filed an indictment against McConley and Van Eman for their fraud, including their conduct directed at Plaintiffs.

46.     The indictment delineates McConley and Van Eman's use of various financial services platforms—including the Defendant UBS entities—to commit their fraud. It also lays out with

precision some aspects of the mountain of information that Defendants would have learned about when they conducted their required due diligence before opening the accounts at issue.

47.     The indictment also marks the first moment at which Plaintiffs could reasonably have learned certain key aspects of how Defendants either responded to—or more frequently failed to respond to—the evidence of the criminal fraud McConley and Van Eman were committing against Plaintiffs. As such, July 25, 2019 marks the date on which they were on notice for purposes of the applicable statutes of limitations.

48.     McConley has pleaded guilty to wire fraud charges and is awaiting sentencing. Van Eman entered a not-guilty plea and is awaiting trial.

49.     We expect that evidence adduced at Van Eman's trial will further illuminate Defendants' roles in the fraudulent scheme. We also expect that evidence obtained through discovery may demonstrate exactly when the Defendants learned of the federal criminal investigation, either through their receipt of criminal subpoenas or otherwise.

### Prior and Continuing Misconduct

50.     Before UBS AG Bank agreed to receive the wires and UBS Financial Services agreed to open accounts for Forrest Capital, Weathervane, McConley and Van Eman, the public record was replete with evidence that they had a well-established track record of conducting themselves in an unlawful and fraudulent manner. The paragraphs that follow briefly summarize some of that evidence, and we expect to uncover additional information as this matter proceeds. But at a minimum, the information set forth here would have been detected by Defendants during their customer-onboarding process, assuming they followed the rules and standards governing the banking and securities industries, as reflected and amplified by their own compliance rules.

51.     In approximately October 2014, plaintiff Dane Miller filed a complaint against McConley in the United States District Court for the Southern District of Florida, alleging conversion. The

complaint details a scheme virtually identical to the fraud committed against Plaintiffs, the only difference being that it concerned the financing of a film rather than a theater production. Upon information and belief, the case was resolved through a negotiated settlement in April 2015.

52.    In approximately December 2014, plaintiff Anthony Buzbee filed a complaint against, among others, Forrest Capital, Weathervane, and Van Eman, in Texas state court, alleging a $1.5-million fraud in connection with the financing of a film. The complaint describes the matter as a "case for fraud against various defendants who purport to be in the movie business in California" and describes the defendants as "charlatans." Upon information and belief, the case was resolved through a negotiated settlement.

53.    In approximately January 2015, several plaintiffs jointly sued Weathervane, Forrest Capital, Van Eman and McConley in the Superior Court of California, alleging conversion relating to the financing of a music festival. The complaint filed in this matter again describes a scheme identical in all material ways to the scheme that was carried out against Plaintiffs, including the use of a Funding Agreement.

54.    In approximately July 2015, plaintiff Superhuman International Pty Ltd. sued Weathervane, Forrest Capital, Van Eman, McConley and his brother Aaron, alleging fraud, conspiracy to commit fraud, and conversion in relation to an identical funding scheme for a motion picture. Upon information and belief, the case was resolved through a negotiated settlement in approximately late 2015 or early 2016 for an amount greater than $1.6 million.

55.    In approximately October 2015, plaintiff Adana Investing, Inc. sued, among others, Weathervane, Forrest Capital, Van Eman, and McConley, alleging that they fraudulently induced plaintiffs to make a $15-million loan to secure a line of credit that would be used to finance the production of films. The allegations are strikingly like the fraud at issue here, including the use of

a Funding Agreement and multiple accounts at the financial institution being used to implement the fraud.

56.     In approximately May 2016, plaintiff Adana Investing, Inc. sued Wells Fargo Bank, alleging that it aided and abetted Forrest Capital's fraudulent scheme to defraud plaintiff of $28.5 million relating to a series of loans intended to finance the production of films. According to the complaint, the deposits made by plaintiff were immediately converted and dissipated, as is the case here.

57.     Upon information and belief, the facts underlying the original Adana lawsuit filed in October 2015—and the follow-on claim brought by Wells Fargo against Weathervane and former bank employees—ultimately resulted in Weathervane, Forrest Capital, and McConley being "fired" by Wells Fargo. This "firing," reportedly citing "loss prevention," preceded Defendants' decision to allow them to open the accounts at issue here.

58.     It can hardly be contested that each of the instances of prior misconduct described in the preceding paragraphs would have been detected by Defendants during the due diligence process they were required to undertake before onboarding Weathervane, Forrest Capital, Van Eman and McConley as customers.

59.     Whether Defendants learned of the serial frauds alleged against McConley and Van Eman and agreed to open the accounts anyway, or failed to learn of them due to shoddy due diligence, is a subject to be explored during discovery.[2] But at this pleading stage, Defendants should be

---

[2] The precise shape of Defendants' failures, unknowable to Plaintiffs without discovery, will determine whether this matter proceeds primarily as an action concerning its affirmative acts or its failures to act. In short, Plaintiffs are pleading in the alternative and expect to recover on theories of affirmative breaches and aiding and abetting, on the one hand, or on theories of negligence, on the other hand, depending on the evidence the discovery process reveals.

charged with constructive knowledge of these multiple instances of prior misconduct. They were "on notice."

60.   The public record indicates that even after Defendants allowed McConley and Van Eman to use their platforms to defraud Plaintiffs, those parties continued their pattern of fraudulent schemes, as described in the following paragraphs.

61.   In approximately July 2016, plaintiff Victoria Burrows sued Forrest Capital and McConley. Upon information and belief, the case centered around allegations of fraud concerning the sale of an investment product and resulted in the entry of a default judgment.

62.   In approximately September 2016, plaintiff Baker Film Fund sued Weathervane, alleging a $1.5-million fraud relating to the financing of a film. The complaint details a scheme virtually identical to the fraud committed against Plaintiffs, the only difference being that it concerned the financing of a film rather than a theater production. Upon information and belief, the case was resolved through a negotiated settlement in August 2017.

63.   In approximately December 2016, plaintiffs Vandermolen Film Co. Ltd. and Bridgeworks Media Capital Ltd. sued Wells Fargo Bank, alleging that it assisted Weathervane and Forrest Capital in executing a $15-million fraud relating to a film-financing deal. The complaint alleges Wells Fargo permitted Weathervane and Forrest Capital to move money from accounts that were to be used only for the film financings, and to siphon that money off for other purposes.

64.   While the Vandermolen Film Co. suit alleges that Wells Fargo was the financial institution that was used in the scheme in which it was victimized, the Burrows and Baker Film Fund cases may well involve fraudulent conduct executed through UBS. If that turns out to be the case—an issue that will be explored in discovery—it will provide still more evidence that Defendants have serially flouted their legal obligations in allowing their customers to be defrauded.

### FINRA Rule 2090 Resulted in UBS Financial Services' Notice of the Fraud

65.     FINRA Rule 2090, like its predecessor NYSE Rule 405, required UBS Financial Services to exercise "reasonable diligence" in opening and maintaining its customer accounts. Specifically, the rule states that "[e]very member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer." The published supplementary material concerning this rule states that the "facts" essential to "knowing the customer" include those required to "comply with applicable laws." As explained below, UBS Financial Services' presumed compliance with Rule 2090 would have put it on notice of the ongoing fraud, a new iteration of which was about to be perpetrated against Plaintiffs.

66.     FINRA's Regulatory Notice 11-02 explains one of the central purposes of Rule 2090's "reasonable diligence" requirement: "a firm should verify the 'essential facts' about a customer under the know-your-customer rule at intervals reasonably calculated to prevent and detect any mishandling of a customer's account…."

67.     Commentators have also highlighted the benefit to both firms and the public of conducting proper diligence at the know-your-customer stage. For firms, it "provides comfort that the firm is not exposing itself to excessive risk of being used by criminals…." And for the public, it has been found that the "broker / dealers, as the 'gateway to the market, is in the most effective position to police its customers."[3]

68.     Conversely, "[i]f something goes wrong with the account, the burden will be upon the broker/dealer to prove that permitting the account to be opened and activity to occur with

---

[3] Matthew Boba, "Doing Business Under FINRA's New Suitability and KYC Rules," *Practical Compliance & Risk Management for the Securities Industry*, March-April 2012, at p. 6.

incomplete information did not violate the reasonable diligence portion of the 'know your customer' obligation."[4]

69.     Brokerage firms such as UBS Financial Services are advised to review account-opening applications carefully, and "quick Internet searches should be conducted on the entity and the individual officers."[5]

70.     Here, to comply with its "Know Your Customer" obligations, UBS Financial Services was obligated to exercise "reasonable diligence" to learn the "essential facts" concerning Forrest Capital, Weathervane, McConley and Van Eman. Presuming it did so, it would have learned that they had been "fired" by their prior brokerage firm and had been repeatedly sued in multiple forums by other victims of their fraudulent financing schemes.

71.     The duties set forth by Rule 2090 are echoed—and more fully fleshed out—by UBS Financial Services' supervisory and compliance manuals. Those manuals identify a "Client Verification Unit" within the New Accounts Department, which is "responsible for reviewing account holder information." They also indicate that the firm maintains the right "to close [an] account" in its discretion.

72.     UBS Financial Services' supervisory manuals state that "The Firm's Know Your Customer ('KYC') policy both incorporates and goes beyond Rule 405," Rule 2090's antecedent. They explain the purpose of the policy as well: "Adhering to the Firm's KYC policy helps to prevent individuals and entities from involving the Firm in illegal activities" and "to identify suspicious activity," among other reasons.

---

[4] *Id.*

[5] *Id.*

73.     The firm instructs its branch managers to "[b]e satisfied that the Financial Advisor knows the client's identity and the source of the client's funds and the business reason for establishing the account." It cautions that they should "[c]onsider the adequacy of the information and whether the client's background and/or source of funds raises red flags that require further investigation." And the firm explains that "it is important" for a branch manager "to bring to the attention of Regional management…any suspicious or potentially suspicious activity."

74.     So plainly under Rule 2090—as amplified and explained by UBS Financial Services' internal compliance procedures—the firm had a duty to conduct a reasonable investigation of Weathervane, Forrest Capital, McConley and Van Eman before allowing them to open and transact in the accounts at issue. For purposes of this pleading, it can fairly be presumed that the firm had prior knowledge of McConley and Van Eman's prior serial frauds.

### Federal Statutes, Regulations and Internal Protocols Resulted in Defendants' Actual Knowledge of the Fraud

75.     A combination of federal statutes and regulations on the one hand, and the Defendants' internal protocols, on the other hand, resulted in Defendants' actual knowledge of the fraud.

76.     The Bank Secrecy Act[6] and related regulations set out rigid requirements for banks and other financial institutions operating in the United States.

77.     All financial institutions operating under the Bank Secrecy Act, including Defendants, must undertake certain steps when onboarding a new client. The required steps—which would have resulted in Defendants' actual knowledge of the fraud being committed by McConley and Van Eman—are summarized in the paragraphs that follow.

---

[6] This Complaint does not assert that the Bank Secrecy Act or any other federal statute or regulation creates a private right of action for non-customers. Instead, our discussion of these provisions is included to demonstrate exactly how and when Defendants received notice of the fraud.

78.     Protocols issued by the Financial Crimes Enforcement Network ("FinCEN") and a variety of other regulatory and law enforcement agencies spell out precisely what the UBS Defendants must do, first when they onboard a new customer, then later as they monitor those customer accounts for signs of criminal activity.[7]

79.     The UBS Defendants, as part of their routine customer-onboarding and account-monitoring duties, would have performed the following acts: (a) obtained and analyzed sufficient information about McConley and Van Eman to understand the nature and purpose of the customer relationship, for the purpose of developing a customer risk profile; (b) conducted ongoing monitoring of the McConley / Van Eman accounts to identify and report suspicious transactions or account activity inconsistent with the stated business purpose of the customer accounts; (c) implemented a greater level of focus on higher risk customers such as McConley and Van Eman; (d) shared information about McConley and Van Eman across business lines, separate legal entities within the larger UBS enterprise, including affiliated support units; (e) cross-checked information about McConley and Van Eman in data systems maintained within UBS for other purposes such as fraud detection; and (f) conducted "Enhanced Due Diligence" on McConley and Van Eman, since their risk profiles suggested a high risk of criminal conduct, including obtaining detailed information about the source of their funds, the purpose of their business and the mechanics of their business operations.

80.     Each of the required acts listed in the preceding paragraph—whether taken alone or together as part of an integrated protocol across UBS entities—would inevitably have resulted in actual knowledge by the Defendants of the severely heightened risk posed by McConley and Van Eman, then almost immediately thereafter, of the theft they were undertaking. But despite this

---

[7] The protocols noted herein are taken from a variety of statutory and regulatory sources that were in force at the time of the alleged misconduct.

heightened risk, which UBS's compliance department later identified as "red flags" indicating "money laundering," UBS agreed to take McConley and Van Eman on as clients as a "favor" to Washington lobbyist Falkoff, a "good friend" of senior UBS personnel.

81.     FinCEN unequivocally states that information provided by higher risk profile customers and their transactions must be reviewed more closely at the account-opening stage and more frequently throughout the term of the customers' relationship with the financial institution. Given the foregoing, this obligation applied to UBS's relationship with McConley and Van Eman. As a result, it can fairly be presumed that the UBS entities acquired real-time knowledge of the risks they posed—not only to Plaintiffs but also to the UBS Defendants themselves—and the criminal scheme they perpetrated.

82.     As noted herein, direct evidence in Plaintiffs' possession makes plain that UBS's compliance department detected in the accounts at issue "red flags" indicating "money laundering."

83.     FinCEN further states that financial institutions, when dealing with higher risk customers such as McConley and Van Eman, should utilize "negative media search programs" as part of their due diligence programs.

84.     With UBS as one of the largest international financial institutions in the world, and the UBS Defendants as very prominent players in the U.S. financial marketplace, it cannot credibly be denied that they would have employed some type of negative media search program. When they did so, they would have acquired actual knowledge of the many allegations of fraud levied against McConley and Van Eman before they ever opened the UBS accounts they used to victimize Plaintiffs, since media coverage of their prior frauds existed. Such coverage would have been

ascertained by accessing the comprehensive and sophisticated media and legal databases available to Defendants.

85.    Finally, FinCEN notes that certain information often triggers financial institutions to take a closer look at customer accounts. Near the top of the list of such information is the receipt of a law enforcement inquiry such as a criminal subpoena.

86.    Here, we know that the FBI ultimately opened the criminal inquiry that has led to the indictments and guilty pleas discussed in earlier paragraphs. Given the complexity and far-ranging nature of the criminal scheme, as well as the many years over which it was carried out, it is reasonable to suspect that the federal investigation began before the date on which McConley and Van Eman opened their UBS accounts. If that turns out to be the case—a fact that will be exposed in discovery—then we will have another piece of evidence proving the Defendants' actual knowledge of the criminal fraud that led to Plaintiffs' losses.

87.    The Office of the Comptroller of the Currency ("OCC") requires regulated banks, including UBS AG Bank, to file a Suspicious Activity Report ("SAR") when they detect account activity that might signal criminal activity.

88.    Upon information and belief, both UBS Defendants would have detected the multiple suspicious transactions noted above, and assuming they complied with their regulatory obligations, would then have filed SARs with the OCC. Plaintiffs will seek these SARs in discovery, and Plaintiffs expect they will further illuminate the Defendants' actual knowledge of McConley and Van Eman's fraud.

**Substantial Assistance Provided by UBS Personnel**

89.    The financial advisor who managed the accounts at issue was Hayes, an experienced professional who works in the UBS Financial Services branch in Washington, DC.

90.     Upon information and belief, Hayes may initially have been reluctant to open the accounts that were ultimately used in the fraud. The reason for her reluctance—whether heightened fraud risk identified through the onboarding due diligence process, or actual knowledge of the prior frauds—is a subject that will be explored in document discovery and depositions.

91.     Upon information and belief, and based on hard evidence in Plaintiffs' possession, Hayes agreed to open the accounts as a "favor" to Washington lobbyist Falkoff. Her acquiescence to Falkoff's request for a "favor" constitutes UBS's first—but far from final—act of substantial assistance to McConley and Van Eman.

92.     Falkoff has acknowledged that he originally brought McConley and Van Eman to UBS, through a contact he had there, telling one of the principals of PTBNL, "The Senior Vice President of UBS is a good friend of mine…. We recommended UBS…."

93.     Falkoff explained to the PTBNL representative that he had direct access to senior UBS personnel that allowed him to gather detailed information about UBS accounts held by McConley. In his words, he "can call Holidae [Hayes] at any time and…say hey, what's really going on, or what's his account looking like, or has he wired this, or whatever…so we can kind of keep tabs on him in…a different way."

94.     This enhanced level of service rendered by UBS concerning the accounts represents another example of substantial assistance. It is hardly typical for a financial services firm to communicate to a third party real-time detailed information concerning accounts, particularly when that third party is owed money by the account holders, as Falkoff's firm apparently was.

95.     As noted above, Falkoff's lobbying firm was among the first recipients of the illicit payments made from the UBS accounts, using Plaintiff PTBNL's money.

96.     Ultimately, Hayes and other UBS personnel observed as McConley and Van Eman received into the accounts the Plaintiffs' collective $3.5 million. They had real-time access to transactions occurring in the accounts, including the multiple highly suspicious outflows noted above, and allowed them to occur.

97.     When the deadline for McConley and Van Eman to return PTBNL's $2.5-million investment had passed without PTBNL receiving the funds, PTBNL approached Falkoff seeking his assistance, since he had a direct relationship with McConley and Van Eman, and a personal friendship with senior UBS personnel.

98.     During a meeting at his Washington, DC office, Falkoff informed PTBNL that he did "not believe Holidae [Hayes] is going to assist." He explained that Hayes had grave concerns about McConley and Van Eman and that if being "at a ten" with a banking client means you are ready to fire them, which he stated was "rare," Hayes was "already at a ten."

99.     At some point while the fraud was ongoing, Hayes communicated to Falkoff that she was "pretty much done" with McConley and wanted him to "take his money elsewhere." Falkoff indicated to PTBNL that despite Hayes's worries, she agreed to keep the accounts open, at the request of Falkoff. This agreement to keep the accounts open constitutes another example of UBS's substantial assistance to McConley and Van Eman's unlawful conduct.

100.    Falkoff also explained to PTBNL the views of UBS's compliance department concerning the accounts used in the fraud: "Compliance has already said, 'We don't want to deal with this kid anymore'" and that under the "banking rules," the account activity presented "red flags" to UBS indicating "money laundering." The decision by the compliance department to allow the accounts to remain open despite these "red flags" represents another example of UBS rendering substantial assistance to McConley and Van Eman's unlawful conduct.

101.    Falkoff further explained to PTBNL that from UBS's perspective, "When you combine quick ins and outs with a few bounced checks here and there, banks and brokerage firms don't want to deal with you anymore." And yet UBS continued to "deal with" McConley and Van Eman, allowing them to complete their fraud.

102.    While UBS Financial Services has refused to provide any substantive information concerning its actions, the evidence available to Plaintiffs indicates that neither Hayes nor her supervisors did anything to halt the looting of their funds from the accounts.

103.    While the fraud was in process, but before Plaintiffs had any concrete idea of what was happening, PTBNL contacted Falkoff for help in figuring out why there was a delay in PTBNL receiving its promised funds. Falkoff told PTBNL that he would contact UBS—presumably Hayes—to obtain information. Specifically, he promised to "touch base with UBS and Ben…to get this all straightened out for you." Upon information and belief, his outreach to Hayes would have served to confirm for UBS that the funds at issue were being stolen.

104.    Falkoff, who PTBNL by this point explicitly understood to be in direct contact with UBS, wrote to PTBNL, "We know [McConley] has not absconded with your funds." In response, PTBNL told Falkoff that because it could not obtain "credible statements from UBS with the location of our funds," they would "have no chance of securing" the theater they had targeted for the staging of "Bull Durham."

105.    Around this same time, after Falkoff had apparently spoken with UBS, Falkoff told PTBNL in a meeting, "The money's not gone." If indeed Hayes communicated this reassurance to Falkoff, as Falkoff claimed in a recorded meeting, this constitutes yet another example of UBS providing substantial assistance to McConley and Van Eman, by assuaging the fears of a fraud victim, forestalling it from pursuing all available options to trace and recover the lost funds.

106.    Ultimately, PTBNL repeatedly contacted multiple UBS employees, both by phone and email. The PTBNL representative reminded them of the strict terms of the Funding Agreement, providing to Hayes by email another copy of both the agreement and a UBS power of attorney, and asked for assurance that the money was safe. This time, contacted directly by a victim of the fraud, Hayes never replied. This refusal by Hayes to engage with PTBNL served to further frustrate Plaintiffs' efforts to trace and recover their funds, substantially assisting McConley and Van Eman in hiding evidence of their theft.

107.    Eventually, an assistant to Hayes informed PTBNL that the account structure they had been promised had never been put in place, and that all but a few thousand dollars was gone from the accounts Plaintiffs had trusted Defendants to help safeguard.

108.    PTBNL, through counsel and through its principal, continued to press UBS for information about the fate of their funds. PTBNL counsel was ultimately directed to a member of UBS Financial Services' compliance department, Sharlene Samuel. Ms. Samuel declined to provide any further information about the whereabouts of the funds. This decision by UBS to stonewall PTBNL's efforts prevented it from pursuing avenues to trace and potentially recover the stolen funds before the trail grew cold.

### UBS Financial Services' Duties Under FINRA Rule 2010

109.    FINRA Rule 2010 mandates that every FINRA member firm "conduct business with high standards of commercial honor" and "maintain just and equitable principles of trade."

110.    While it is unsettled whether the violation of a self-regulatory rule, by itself, gives rise to a private right of action, the best-reasoned precedent sets out the rationale for when finding a private right of action is appropriate. "The touchstone for determining whether or not the violation of a particular rule is actionable should properly depend on its design 'for the direct protection of

investors…[and where] one of the functions of [the rule] is to protect the public, … permitting a private right of action for its violation is entirely consistent with the purposes of the statute." *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 142 (7th Cir. 1969).

111.   According to the SEC, Rule 2010 was designed to "protect the investing public…from dishonest practices that are unfair to investors…." SEC Release No. 34-59547, March 10, 2009 (analyzing Rule 2010's predecessor, NASDAQ Rule 2110). As such, Rule 2010 falls into the class of self-regulatory rules that does create a private right of action.[8]

112.   In the present context, Rule 2010 required UBS Financial Services to avoid permitting its systems, infrastructure and employees to be deployed by Weathervane, Forrest Capital, Van Eman and McConley to commit their fraud against Plaintiffs.

## Count One: Aiding and Abetting Fraud (All Defendants)

113.   Plaintiffs restate, and incorporate herein by reference, every paragraph contained in this Complaint.

114.   McConley and Van Eman defrauded Plaintiffs as described herein.

115.   Defendants acquired actual knowledge of the fraud that was being perpetrated against Plaintiffs through the mandated due diligence they conducted, as described in Paragraphs 65 through 88.

116.   In the alternative, the allegations herein support a reasonable inference that Defendants, if they failed to conduct the required due diligence, consciously avoided acquiring actual knowledge of the fraud.

---

[8] Tribunals routinely hear cases brought by customers asserting a private right of action under Rule 2010. *See*, *e.g.*, *Adams et al. v. Goslin et al.*, FINRA Case No. 16-02756 (awarding damages where claims included violations of Rule 2010).

117.    Defendants aided and abetted the fraud by taking the affirmative steps described in Paragraphs 89 through 108, and through other steps that will be exposed during the discovery process.

118.    The affirmative steps undertaken by Defendants amounted to substantial assistance, allowing the fraud to succeed.

119.    As a direct and proximate consequence of Defendants' aiding and abetting the fraud, Plaintiffs suffered damages in an amount to be determined at trial.

**Count Two: Aiding and Abetting Breach of Fiduciary Duty (All Defendants)**

120.    Plaintiffs restate, and incorporate herein by reference, every paragraph contained in this Complaint.

121.    McConley and Van Eman owed fiduciary duties to Plaintiffs due to Plaintiffs' entrusting them with a combined $3.5 million in funds to finance their theatrical productions.

122.    Defendants, through their receipt of the Funding Agreements and through the knowledge they acquired during the mandated due diligence they conducted, knew of the fiduciary duties owed by McConley and Van Eman to Plaintiffs.

123.    In the alternative, the allegations herein support a reasonable inference that Defendants, if they failed to conduct the required due diligence, consciously avoided acquiring actual knowledge of the breaches of fiduciary duty.

124.    Defendants aided and abetted McConley and Van Eman's breaches of fiduciary duty by taking the affirmative steps described in Paragraphs 89 through 108, and through other steps that will be exposed during the discovery process.

125.    As a direct and proximate consequence of Defendants' aiding and abetting the breaches of fiduciary duty, Plaintiffs suffered damages in an amount to be determined at trial.

**Count Three: Negligence and Gross Negligence (All Defendants)**

126.    Plaintiffs restate, and incorporate herein by reference, every paragraph contained in this Complaint.

127.    As members of the financial services industry, Defendants were obligated to perform their duties in a reasonable manner, consistent with the industry standards and practices.

128.    Among those industry standards and practices was the requirement that they conduct "reasonable diligence" concerning their customers during the know-your-customer process, prior to opening accounts and allowing them to receive and disburse funds.

129.    This requirement—imposed upon Defendant UBS Financial Services as a member of FINRA and upon Defendant UBS AG Bank as a regulated national bank, by their own compliance rules and more generally as longstanding members of the financial services industry—carried with it a legally cognizable standard of care and duty.

130.    In addition, industry standards, practices and FINRA Rule 2010 imposed a duty on Defendant UBS Financial Services to "conduct business with high standards of commercial honor" and "maintain just and equitable principles of trade."

131.    Through the failures described above, Defendants negligently breached these duties.

132.    Defendants' conduct reflects a reckless indifference to the rights of Plaintiffs.

133.    Put another way, Defendants' conduct shows a failure to use even slight care or conduct that is so reckless as to show complete disregard for the rights of Plaintiffs.

134.    As explained throughout this Complaint, it was reasonably foreseeable that a failure to uphold these duties would result in direct harm to Plaintiffs, whose funds were entrusted to Defendants.

135.    As a direct and proximate consequence of Defendants' negligence, rising to the level of gross negligence, Plaintiffs suffered damages in an amount to be determined at trial.

### Count Four: Negligent Supervision (UBS Financial Services)

136.    Plaintiffs restate, and incorporate herein by reference, every paragraph contained in this Complaint.

137.    Federal securities laws, as well as the rules and regulations of FINRA, require broker-dealers to supervise their brokers and the accounts they maintain to prevent violations of federal securities law and other unlawful conduct.

138.    Section 15(b)(4)(E) of the Securities and Exchange Act of 1934 requires broker-dealers to supervise reasonably, with a view toward preventing violations of the federal securities laws, persons subject to their supervision.

139.    The essential purpose of broker-dealer supervision is to ensure that brokers comply with their professional and legal obligations. *See* NASD Notice to Members 96-32, reminding broker-dealers that "[s]upervision is the cornerstone of securities industry self-regulation and depends on members establishing and implementing supervisory procedures and systems designed to achieve compliance with the NASD Rules of Fair Practice and federal securities laws."

140.    FINRA Rules also required Defendant UBS Financial Services to institute their own internal rules concerning the supervision and monitoring of their brokers to protect customers from potentially unsuitable and fraudulent activity by their brokers. Specifically, FINRA Rule 3110, which sets out members' obligations regarding supervision, mandates that Defendant UBS Financial Services (1) design and implement a supervisory system, (2) conduct internal inspections concerning its business to detect and prevent violations of securities laws and regulations and (3) review and investigate certain transactions.

141.    Where the evidence suggests that Defendant UBS Financial Services personnel, e.g., Holidae Hayes, may have engaged or been involved in wrongdoing, the burden is on the brokerage firm to show it supervised its brokers and accounts properly.

142.    By not reporting or addressing the suspected fraud by Forrest Capital, Weathervane, McConley and Van Eman, or taking steps to prevent it from occurring, Defendant UBS Financial Services failed to meet the standards for supervision for the securities industry.

143.    As a direct and proximate consequence of Defendant UBS Financial Services' negligent supervision, Plaintiffs suffered damages in an amount to be determined at trial.

### Count Five: Breach of Fiduciary Duty (UBS Financial Services)

144.    Plaintiffs restate, and incorporate herein by reference, every paragraph contained in this Complaint.

145.    It is widely recognized that securities brokerage firms owe a fiduciary duty to their customers. *Rolf v. Blyth Eastman Dillon & Co., Inc.*, 424 F. Supp. 1021, 1036 (S.D.N.Y. 1977), *aff'd and remanded*, 570 F.2d 38 (2d Cir. 1978) (subsequent history omitted); *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 819-20 (6th Cir. 1981); *Conway v. Icahn & Co.*, 16 F.3d 504, 509 (2d Cir. 1994); *Marchese v. Shearson Hayden Stone, Inc.*, 734 F.2d 414, 418 (9th Cir. 1984).

146.    UBS Financial Services, as the broker for these accounts, owed a fiduciary duty to Plaintiffs, and that duty carried with it several obligations: (1) to act in a fair, honest, just, trustworthy and equitable manner; (2) to transact business only after receiving prior authorization from Plaintiffs; (3) to act in furtherance of Plaintiffs' best interests; (4) to do all in their power to protect the accounts and funds; and (5) to take reasonable steps to ensure that Plaintiffs' funds were not lost through the criminal acts of its customers.

147.    UBS conducted itself toward Plaintiffs in a willful, reckless and negligent manner, placing their funds at extraordinary risk, which was known or should have been known by UBS Financial Services, its branch managers, compliance officers, registered representatives and wire department. UBS Financial Services, acting through its branch managers, compliance officers and other supervisors, failed to exercise the required supervision and, upon information and belief, violated its own compliance procedures, FINRA Rules 2010 and 2090, regulations and standards of conduct required in the securities industry.

148.    As a direct and proximate consequence of Defendant UBS Financial Services' breaches of fiduciary duty, Plaintiffs suffered damages in an amount to be determined at trial.

### Count Six: Breach of FINRA Rule 2090 (UBS Financial Services)

149.    Plaintiffs restate, and incorporate herein by reference, every paragraph contained in this Complaint.

150.    As a FINRA member firm, Defendant UBS Financial Services is obligated to comply with the strictures of FINRA Rule 2090, and the requirement that it do so constitutes a legally cognizable duty. Rule 2090 was designed "for the direct protection of investors…[and] one of the functions of [the rule] is to protect the public, … [so] permitting a private right of action for its violation is entirely consistent with the purposes of the statute." A violation of Rule 2090, therefore, gives rise to a private right of action.

151.    Through the conduct described above, Defendant UBS Financial Services breached Rule 2090 and the duty it owed to Plaintiffs thereunder.

152.    As a direct and proximate consequence of Defendant UBS Financial Services' breaches of Rule 2090, Plaintiffs suffered damages in an amount to be determined at trial.

## Count Seven: Breach of FINRA Rule 2010 (UBS Financial Services)

153.     Plaintiffs restate, and incorporate herein by reference, every paragraph contained in this Complaint.

154.     As a member firm, Defendant UBS Financial Services is obligated to comply with the strictures of FINRA Rule 2010, and the requirement that it do so constitutes a legally cognizable duty. Rule 2010 was designed "for the direct protection of investors…[and] one of the functions of [the rule] is to protect the public, … [so] permitting a private right of action for its violation is entirely consistent with the purposes of the statute." A violation of Rule 2010, therefore, gives rise to a private right of action.

155.     Through the conduct described above, Defendant UBS Financial Services breached Rule 2010 and the duty it owed to Plaintiffs thereunder.

156.     As a direct and proximate consequence of Defendant UBS Financial Services' breaches of Rule 2010, Plaintiffs suffered damages in an amount to be determined at trial.

## PUNITIVE DAMAGES

157.     By reason of Defendants' reckless and grossly negligent conduct, their breaches of the duties they owed to Plaintiffs, their violations of their own compliance guidelines and the statutes, rules and regulations governing their conduct, all of which were implemented to protect entities such as Plaintiffs from the frauds that were perpetrated here, and by reason of Defendants' failure to supervise their employees and the other personnel responsible for the supervision of the accounts, Plaintiffs are entitled to recover punitive damages from Defendants.

158.     Defendants' affirmative conduct, compliance breakdowns and total failure to supervise the conduct of their employees and the accounts at issue were perpetrated in such a gross, reckless manner as to be deserving of the imposition of punitive damages in an amount to be determined.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request the following relief:

I.      On ***Count One***, compensatory damages in an amount not less than $3.5 million, plus interest and costs;

II.     On ***Count Two***, compensatory damages in an amount not less than $3.5 million, plus interest and costs;

III.    On ***Count Three***, compensatory damages in an amount not less than $3.5 million, plus interest and costs;

IV.     On ***Count Four***, compensatory damages in an amount not less than $3.5 million, plus interest and costs;

V.      On ***Count Five***, compensatory damages in an amount not less than $3.5 million, plus interest and costs;

VI.     On ***Count Six***, compensatory damages in an amount not less than $3.5 million, plus interest and costs;

VII.    On ***Count Seven***, compensatory damages in an amount not less than $3.5 million, plus interest and costs; and

VIII.   On all counts, an award of attorney's fees and punitive damages sufficient to punish Defendants and deter them from engaging in similar conduct in the future.

## JURY DEMAND

Plaintiffs hereby request a jury trial of this action.

Dated:  New York, New York
        May 19, 2020

                                Respectfully submitted,

                                THE LAW OFFICE OF KEVIN GALBRAITH

                                Kevin D. Galbraith, Esq. (KG-7512)

                                236 West 30th Street, 5th Floor
                                New York, NY 10001
                                Phone: (212) 203-1249

                                *Counsel for Plaintiffs*